UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|     GREGORY RIDGE | ) | Case No. 09-16223-SSM |
| | ) | Chapter 7 |
|                Debtor | ) | |
| | ) | |
| MARINA DISTRICT DEVELOPMENT | ) | |
| CO., LLC | ) | |
| | ) | |
|                Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 09-1351 |
| | ) | |
| GREGORY RIDGE | ) | |
| | ) | |
|                Defendant | ) | |

**MEMORANDUM OPINION**

This is an action to determine the dischargeability of a $250,000 gambling debt incurred by the debtor when he was issued chips in exchange for "markers" in that amount while playing blackjack at the Borgata Hotel Casino & Spa in Atlantic City, New Jersey. A trial at which the creditor and the debtor were each represented by counsel was held on July 15, 2010. At the conclusion of the trial, the court took the issues under advisement. For the reasons stated, the court concludes that the plaintiff has failed to establish that its reliance on the debtor's representation that he had sufficient funds in his checking account to pay the markers was reasonable, or, indeed, that it relied on the representation at all. This opinion constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(a).

1

Procedural Background and Findings of Fact

Gregory Ridge ("the debtor") filed a voluntary petition in this court on August 1, 2009, for relief under chapter 7 of the Bankruptcy Code and received a discharge of his dischargeable debts on May 13, 2010. Marina District Development Co., LLC, which operates the Borgata Hotel and Casino in Atlantic City, New Jersey ("the Borgata" or "plaintiff"), filed a timely complaint on November 4, 2009, to determine the dischargeability of its claim against the debtor.

The Borgata, like many casinos, extends credit to certain patrons who gamble there. The debtor first obtained credit at the Borgata in October 2006 when his business partner, John Long Jr., called his contact there—a man named Dominic—and provided the defendant's social security number so that the Borgata could put together a credit application for him. The application is a two-page form document, partly filled out by Borgata staff and partly filled out by the applicant. Trial Exhibit 1. The first page of the application lists the applicant's home address, business title and address, his social security number, and the name, address and account number of one of his bank accounts. Left blank are spaces for the applicant's total gross income, total assets, and casino debts. The defendant's indebtedness is listed as "0." The application also lists the amount of credit requested and includes a "Privacy Statement" and "Customer Agreement" below which the applicant signs his name. *Id.*

The second page is filled in entirely by the Borgata's casino credit staff and verifies that the applicant's credit report was obtained; determines whether the applicant has credit at any other casinos and, if so, whether there is a present or outstanding balance; the average and current balance on the applicant's bank account; and finally, whether the applicant is approved for credit and the number of days after credit is extended that the applicant has to pay the debt.

The debtor's application reflects that he was approved for $150,000 in credit and that once drawn on, he had 45 days to pay down the credit before his counter checks, discussed below, would be deposited. *Id.* Page two also indicates that there was between $4,000 and $5,000 in his SunTrust Bank account in October 2006, and that he had $200,000 in credit at other casinos, but no present balance. *Id.*

On or about October 25, 2006, the debtor visited the casino. The Borgata's Director of Casino Credit, Gary Martin, testified that the application was already filled out when the debtor arrived and that he had only to present identification and sign it. During that visit the debtor played blackjack and won some money, although he could not remember how much. About a month later, the Borgata increased the debtor's credit limit at his request from $150,000 to $250,000.

The debt at issue was incurred during the debtor's next visit to the Borgata on January 10, 2007. Both he and Mr. Long flew to Atlantic City in the Borgata's private plane from Dulles airport in Virginia. Upon arriving at the Borgata, the debtor was escorted to a private room to play blackjack. Beginning early in the morning on January 11, 2006, and continuing to about six o'clock in the evening that same day, the debtor drew down the entirety of his $250,000 credit line in exchange for five markers totaling that amount.

At the Borgata, as at other New Jersey casinos, markers take the form of counter checks drawn on the customer's bank account. A printer located at the gaming table generates the checks–based on the bank account information the customer has previously provided—when the customer requests chips. The payee of the counter check is the Borgata. Four counterparts of each marker are made, three of which have the player's signature—copied from the credit

3

application— electronically inserted. The fourth is manually signed by the player at the table. The player must sign the marker in order to receive gaming chips. A statement is printed on the counter check to the left of a signature box which reads, "I represent that I have received cash for the above amount and that *said amount is on deposit in said bank or trust company in my name*. It is free from claims and is subject to this check." Trial Exhibit 2 (emphasis added). No inquiry is made of the drawee bank—either when the customer arrives or when chips are requested—to verify the customer's balance on deposit, at least in part because a request for chips does not necessarily (and did not here) occur during normal banking hours.

The debtor's markers show that he received $50,000 in chips at 3:49 a.m., $40,000 at 5:22 a.m., $50,000 at 5:30 a.m., $100,000 at 6:30 p.m., and $10,000 at 8:53 p.m. on January 11, 2007. The debtor testified that he did not remember whether he signed the markers presented to him at the table, although he does recall receiving chips.[1]

The Borgata, like other casinos, does not immediately present a customer's marker but essentially treats it as an IOU and allows the customer a period of time in which to redeem it by paying the amount owed in cash or by wire-transfer or check. Under the Borgata's policy and New Jersey law, the debtor had forty-five days from January 11, 2007 to pay off the markers.[2]

---

[1] For reasons that are unclear, the copies offered into evidence were the ones bearing the debtor's reproduced signature, not the ones bearing his original signature. The court is satisfied from the testimony, however, that the originals—which are the only ones that would have actually been put through the banking system, the other three being simply for internal accounting purposes—were signed by the debtor and that, except for bearing an original rather than reproduced signature, are identical to the copies introduced into evidence.

[2] According to Mr. Martin, a counter check must be for more than $5,000 for a player to receive a delay period of 45 days.

*See* N.J. Stat. Ann. §5:12-101c.[3]  If no payment was received by the 45th day, the signed counterparts of the counter checks would be deposited by the casino.  The debtor testified that he called the Borgata and told them he was sending a check and asked them to hold it until he could sell his home to pay off his debts.  Around February 23, 2007, he sent a check for $250,000 drawn upon his Wachovia bank account.  After the Borgata received the Wachovia check, it cancelled the markers because alternative payment had been received.  According to Mr. Martin, the Borgata did not hold the Wachovia check as the debtor requested because it was not permitted to do so under New Jersey law.  After the Wachovia check was deposited, it was returned for insufficient funds.  *See* Trial Exhibit 3.

The amount on deposit in the debtor's SunTrust account on January 9, 2007, was $29,494.59, and the amount on deposit in his Wachovia account on February 23, 2007, was $495.18.  He testified that he tried to sell his home to pay the debt, and that when it did not sell, he tried to refinance his mortgage.

---

[3] The relevant part of the statute states:
> When a casino licensee or other person licensed under this act, or any person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, cashes a check in conformity with the requirements of subsection b. of this section, the casino licensee shall cause the deposit of such check in a bank for collection or payment, or shall require an attorney or casino key employee with no incompatible functions to present such check to the drawer's bank for payment, within *** (3) 45 calendar days of the date of the transaction for a check in an amount greater than $5,000.00. Notwithstanding the foregoing, the drawer of the check may redeem the check by exchanging cash, cash equivalents, chips, or a check which meets the requirements of subsection g. of this section in an amount equal to the amount for which the check is drawn . . . .

N.J. Stat. Ann. §5:12-101c.

Conclusions of Law and Discussion

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. An action to determine the dischargeability of a debt is a core proceeding in which a final judgment or order may be entered by a bankruptcy judge. 28 U.S.C. § 157(b)(2)(I). Venue is proper in this district under 28 U.S.C. § 1409(a). The defendant has been properly served and has appeared generally.

II.

A.

A chapter 7 discharge does not discharge an individual debtor from certain specified categories of debt, including debts

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*;
> [or]
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive.

§ 523(a)(2), Bankruptcy Code. It is important to note that different standards apply depending on whether the false statement is one "respecting the debtor's . . . financial condition." If it is, the statement must be in writing and the creditor must have "reasonably" relied on it.

§ 523(a)(2)(B), Bankruptcy Code. Other types of misrepresentations need not be in writing and the creditor's reliance need only be "justifiable," which is a lesser standard than "reasonable." § 523(a)(2)(A), Bankruptcy Code; *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). The burden of proof is on the plaintiff, and the standard of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

B.

The debtor's only arguable misrepresentation is the printed statement on the markers that the stated amount was on deposit in the bank in his name. Since the Borgata asserts the debtor is liable under both § 523(a)(2)(A) and § 523(a)(2)(B), Complaint at ¶¶ 13-16, and since these provisions are mutually exclusive, *Blackwell v. Dabney*, 702 F.2d 490, 492 (4th Cir. 1983), it is necessary to first determine whether the marker is a statement regarding the debtor's financial condition. The Fourth Circuit has held that a statement regarding one's financial condition for purposes of 523(a)(2)(B) is not limited to formal financial statements. *Engler v. Van Steinburg*, 744 F.2d 1060, 1060-61 (4th Cir. 1984) (explaining that statements regarding financial conditions are not limited to formal financial statements, and holding that a false oral statement that collateral being offered as security was unencumbered was a statement concerning the debtor's financial condition). Indeed, in *Trump Plaza Assocs. v. Poskanzer (In re Poskanzer),* the court, under similar facts, held that casino markers that included language certifying that funds were on deposit in a debtor's bank account to cover the amount of the marker were statements regarding the debtor's financial condition. 143 B.R. 991, 1000 (Bankr. D.N.J. 1992). The marker the debtor signed included the following pre-printed language: "I represent that I have received cash for the above amount and that said amount is on deposit in said bank or trust

7

company in my name.  It is free from claims and is subject to this check." Trial Exhibit 2.  This statement not only addresses the purported minimum account balance, but states that the balance is not subject to liens or claims.  As in *Poskanzer*, the marker is a statement regarding the debtor's financial condition and, as such, the test used to determine the dischargeability of the debt is the one stated in § 523(a)(2)(B). *Blackwell v. Dabney*, 702 F.2d 490, 492 (4th Cir. 1983) (holding that where debtor's misrepresentations are statements regarding the debtor's financial condition, § 523(a)(2)(B) applies to the exclusion of § 523(a)(2)(A)).

The statement must also be materially false.  Here it is undisputed that on the two days the debtor gambled at the Borgata, his SunTrust bank account had a balance of $29,494.59. Trial Exhibit 4.  By accepting gaming chips and signing the marker for $250,000, it is clear that his assertion that he had sufficient unencumbered funds on deposit is materially false.

With respect to the debtor's intent to deceive, direct proof is not necessary; instead, the court may draw inferences from the circumstances surrounding the statement.  *Norwest Card Servs. v. Barnacle (In re Barnacle)*, 44 B.R. 50, 54-5 (Bankr. D. Minn. 1984).  To be sure, the evidence falls far short of showing that the debtor intended to welsh on his debt to the Borgata.  It is clear from his testimony that he genuinely hoped to win back his losses, and once it was obvious that he could not do so, he explored other routes that might enable him to pay the debt.  But for the purpose of §523(a)(2), it is not necessary that the debtor enter into a transaction with the intent to stiff a creditor.  Rather, it is sufficient that the debtor intentionally misrepresented an existing fact upon which the creditor had a right to rely in deciding whether or not to enter into the transaction.  Here, the issue is not whether the debtor intended or expected to make the

Case 09-01351-SSM    Doc 19    Filed 08/24/10    Entered 08/24/10 16:43:50    Desc Main
Document      Page 9 of 11

markers good, but whether he had the funds on deposit to do so. Based on all the evidence, the court can only conclude that the debtor had the requisite intent to deceive.

The final element is whether the Borgata reasonably relied on the statement. Reasonable reliance requires, among other things, actual reliance. *See Field v. Mans*, 516 U.S. at 68, 116 S. Ct. at 442. ("Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance in itself. . . ."). In *Mirage-Casino Hotel & Treasure Island Corp. v. Simpson (In re Simpson)*, the bankruptcy court held that where a casino relied not on a debtor's credit application or signed markers, but his play and pay history, it did not rely, much less reasonably rely, on the debtor's statements regarding his financial condition. 319 B.R. 256, 261 (Bankr. M.D. Fla. 2003).

The issue of actual reliance in this case is admittedly a close one. Mr. Martin testified that pit bosses, who present gamers with the markers, have no discretion as to whether to extend credit to a player. The credit, as he put it, is already available once the credit application is signed by the applicant. He also testified, however, that players must sign the original of the marker presented to them before they can receive chips. The reliance issue is complicated by the fact that both the plaintiff and the debtor knew that the debtor had 45 days in which to pay the gambling debt. *See* N.J. Stat. Ann. §5:12-101c. (2009). The marker then is more akin to a promissory note than to an ordinary check, which both the drawer and the payee would normally expect to be promptly presented. It permits the casino to draw upon the bank account *if* the debt is not paid within the time specified. At the same time, the representation that a customer had a particular amount on deposit on the date a marker is signed would provide no assurance that the

same funds would be available 45 days later. Much can obviously happen in 45 days, and fraud requires a misrepresentation as to an existing fact and not a future occurrence.

The debtor testified that he believed he was extended credit to keep his business partner, John Long Jr., who had a credit line at the casino of over $1 million, happy. There is also some evidence that the debtor has some sort of play and pay history, although it was not fully developed. On cross-examination the debtor testified that he had won at the Borgata before, although he would not admit to winning as much as $300,000 during a single gambling session.

There is evidence on both sides. Mr. Martin himself testified that the debtor already had credit available to him before he requested the markers. Although signing the markers is a necessary condition to receiving gambling chips, the fact that the casino will not deposit the markers immediately and permits payment from other accounts and in other forms significantly undermines any actual reliance on the debtor's statement that he had sufficient money in his SunTrust account on that day to cover the markers. This is particularly true since the one and only time the Borgata actually verified the account balance, the debtor had less than $5,000 in the account, yet the casino approved him for $150,000 in credit. Having considered all the evidence, the court cannot find that the Borgata has met its burden of showing that it relied on the debtor's statement that he had funds in SunTrust equal to the amount of the markers. It appears, rather, that it relied primarily if not exclusively on his credit history with other casinos, and the credit report it pulled when the marker was granted. But even if it did rely on the pre-printed statement on the marker, such reliance could hardly have been reasonable when its own inquiry of the bank in question did not suggest that the debtor had *ever* had a balance sufficient to pay the credit that was extended.

A separate judgment will be entered determining that the $250,000 debt is dischargeable and has been discharged.

Date: _____    _____
                                          Stephen S. Mitchell
Alexandria, Virginia                      United States Bankruptcy Judge

Copies to:

Ronald W. Stern, Esquire
801 North Fairfax St., Ste. 106
Alexandria, VA 22314-1757
Counsel for the plaintiff

Nathan A. Fisher, Esquire
3977 Chain Bridge Road, #2
Fairfax, VA 22030
Counsel for the defendant